**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**UNITED STATES OF AMERICA**                                               **PLAINTIFF**

**V.**                              **CASE NO. 22-CR-50030**

**CHARLES EDWARD ROBINSON, III**                              **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

On December 7, 2021, Defendant Charles Edward Robinson, III, pulled into a Dollar General parking lot. Fayetteville Police Department Corporal (now Sergeant) Matthew Townsend pulled in behind him. He told Mr. Robinson that he had failed to stop at multiple stop signs and asked for identification.

Unbeknownst to Mr. Robinson, this was not a routine traffic stop. The day before, a confidential source ("CS") contacted law enforcement alleging Mr. Robinson was involved in drug trafficking and unlawfully possessed several firearms. After pulling him over, Corporal Townsend detained him until a K-9 Unit could arrive and conduct a sniff test. About 35 minutes later, the K-9 Unit arrived and alerted. Corporal Townsend searched the car. He discovered approximately 227.8 grams of marijuana and two firearms—which now form the basis for significant criminal liability.

Mr. Robinson argues the search of his car violated his Fourth Amendment rights because Corporal Townsend unlawfully extended the stop; the K-9 sniff was unreliable; and the search itself exceeded its lawful scope. He urges the Court to exclude from use at trial any evidence obtained as a result. For the reasons set forth below, the Court **DENIES** Mr. Robinson's Motion to Suppress.

## I.  FINDINGS OF FACT

On September 2, 2022, the Court held an evidentiary hearing on Mr. Robinson's Motion to Suppress. Detective John Mackey of the 4th Judicial District Drug Task Force ("DTF"), Corporal Townsend, and Corporal Jason McDaniel, a K-9 officer formerly with the Fayetteville Police Department and now retired, each testified. The Court also accepted into evidence transcripts of Detective Mackey's testimony to the Grand Jury on April 20, 2022, and July 26, 2022; Corporal Townsend's written narrative of the encounter, submitted as part of a police report; Corporal Townsend's dash cam and bodycam footage; an audio file recording radio traffic among officers; photos of the items seized from Mr. Robinson's vehicle; and K-9 certifications. At the hearing's conclusion, the Court heard oral argument from both parties.

After considering these materials and the parties' respective positions, the Court finds the following facts to be true by a preponderance of the evidence.

### A.  Investigation

On December 6, 2021, a confidential source ("CS") contacted Detective Mackey with a tip. The CS claimed an individual with the street name "Seven" was dealing methamphetamine and marijuana in Fayetteville.

According to the CS, Seven was a black male with light skin and a "short Afro hair style," around 40 years old. *See* Doc. 35, p. 1. The CS stated that Seven drove a silver passenger car and had been living at 428 East 13th Place in Fayetteville for several months. The CS further alleged he personally saw Seven with two firearms, and that Seven often carried both drugs and the firearms in a black backpack.

When the CS and Detective Mackey met in person the following morning, the CS showed Detective Mackey screenshots of recent text messages Seven had sent him. Detective Mackey testified that the screenshots showed Seven threatening the CS over an outstanding drug debt and a gun Seven apparently loaned to the CS and wanted back. The CS provided Seven's phone number, which Detective Mackey ran through a police database. The number belonged to Mr. Robinson.

Over the next few hours, Detective Mackey worked to verify the CS's tip. He drove to 428 East 13th Street, where he observed a silver car parked in front of the residence. The vehicle belonged to Crystal Branch, and several patrol incident reports suggested Ms. Branch and Mr. Robinson were in a relationship. Detective Mackey also pulled a driver's license photo of Mr. Robinson and texted it to the CS, asking, "Who is this?" According to Detective Mackey, the CS replied, "That's Seven." He ran a criminal record check, which revealed that Mr. Robinson was a registered sex offender from Pine Bluff and had several felony convictions.

Detective Mackey decided to set up surveillance. DTF detectives positioned themselves near 428 East 13th Street sometime between 2 p.m. and 3 p.m. Detective Mackey also pulled a patrol officer, Corporal Townsend, into the investigation. After a quick briefing by phone, he asked Corporal Townsend to station himself near the residence and, if probable cause existed, execute a traffic stop on any individual leaving the residence. Corporal Townsend parked on a side street north of the residence and waited for further instructions.

Shortly thereafter, Mr. Robinson showed up to the house on foot, black backpack in tow. He went inside but reemerged almost immediately to put the backpack in the silver

car. He went inside again, exited a few minutes later, and rifled through the trunk of the car before getting in and driving away.

Detective Mackey picked up his tail at 13th and Washington. According to radio traffic between officers, Mr. Robinson rolled through the stop sign at the intersection there. Over the next few minutes, Detective Mackey observed Mr. Robinson make other traffic violations. At one point, Mr. Robinson pulled into a lane of vehicles waiting to turn but became frustrated with the delay, reversed, and took an alternate route.

Detective Mackey conveyed Mr. Robinson's location and the infractions he witnessed to Corporal Townsend, who eventually caught up to him. At 3:54 p.m., Mr. Robinson turned into the Dollar General parking lot. Corporal Townsend pulled in after him. Detective Mackey positioned himself in an adjacent parking lot to watch the encounter.

### B. Traffic Stop

Bodycam footage captured Corporal Townsend exiting his vehicle at 3:54:12 p.m. and telling Mr. Robinson, who had already exited his car, to "hold up." Mr. Robinson immediately complied, responding, "Oh shit, I didn't even see you behind me, man."

Corporal Townsend explained to Mr. Robinson that he had run several stop signs. Mr. Robinson was annoyed and asked, "You talking about coming across the dip when I turned that way?" Corporal Townsend affirmed and Mr. Robinson responded, "All right, man." Pulling out his wallet to hand Corporal Townsend his license, he muttered to himself, "Damn, I didn't even know I ran that motherfucker man. Damn."

Corporal Townsend then asked Mr. Robinson if he had anything illegal on him and requested permission to search him. Mr. Robinson replied that he did not have anything

illegal on him, but Corporal Townsend could pat him down regardless. Corporal Townsend did so; he did not find any weapons or contraband. At this point, Mr. Robinson stated, "You searching me good as hell, I ain't got nothing, I just came to get a fucking charger, you pat me down like I done something wrong." Mr. Robinson explained that he drove up to Dollar General to get a new phone charger because his girlfriend was using his.

At 3:59:42 p.m., Corporal Townsend asked Mr. Robinson if he had anything illegal in his car. Mr. Robinson responded that he didn't know because it was not his car. Corporal Townsend asked for permission to search it. Mr. Robinson stated, "I think you need to get her here, let me call her," and turned to pick up his phone. Corporal Townsend told him he was not allowed to make any phone calls. Mr. Robinson, acquiescing, stated, "Well, you call her then." Corporal Townsend refused, continuing to press Mr. Robinson for permission to search the car.

At some point, Mr. Robinson put one hand in his pocket. He immediately withdrew it though, opening his hand to show that he wasn't holding anything. Corporal Townsend asked if he could search Mr. Robinson's pockets, and Mr. Robinson consented. Corporal Townsend searched Mr. Robinson's pockets but did not find any weapons. As Mr. Robinson pulled his pants up and tightened his belt, Corporal Townsend used his radio to request a canine unit. The time was 4:01:51 p.m.

At that point, Mr. Robinson proclaimed, "Yeah go on and search the motherfucker. I don't give a fuck. It's her shit, I don't give a damn. Search that motherfucker. You can search it." Corporal Townsend explained he needed to wait for another officer to arrive.

At 4:03 p.m., another officer arrived on scene. Mr. Robinson walked over to him and began explaining why he made the U-turn. At 4:08 p.m., Corporal Townsend explained to Mr. Robinson that he had requested a canine unit and one was enroute. More than once, Mr. Robinson expressed his confusion and frustration, stating, for example, "I'm tripping because when he searched me, he searched me like I done something wrong," and, later, "There has got to be something to this. On a traffic stop, there's got to be something to this, on a traffic stop, man, for y'all to want to bring a canine and shit out."

Mr. Robinson asked if he could call his girlfriend but was told, "No." He also asked if he could go to the restroom, offering for Corporal Townsend to come with him.  He was again told, "No."

At 4:26:04 p.m., the K-9 Unit arrived. At 4:28:10 p.m., Corporal McDaniel, the canine handler, asked the two officers and Mr. Robinson to step back. About 30 seconds later, he gestured for Corporal Townsend to come over and stated, "Point your bodycam down there, please." Corporal Townsend's bodycam shows the canine, Dex, sitting in next to the front passenger door.

At 4:29:41 p.m., Corporal McDaniel walked back over to the officers. Corporal Townsend asked him "if we're good." Corporal McDaniel said, "Yes."

### C.  Search of the Vehicle

At 4:31:19 p.m., Corporal Townsend began to search the vehicle. He opened the front driver's-side door but immediately moved to search the back seat. He pulled a few items out of the pocket on the back of the driver's seat before opening the backpack. Inside, he found a large quantity of marijuana and two guns inside.

6

Corporal Townsend turned and walked back toward Mr. Robinson, preparing to arrest him. Mr. Robinson bolted. A chase ensued. Mr. Robinson led officers across traffic and into a nearby warehouse, but they eventually caught up and placed him under arrest. Mr. Robinson made incriminating statements to officers in a post-*Miranda* interview.

### D.  Charges

Mr. Robinson was initially named in a two-count Indictment (Doc. 1) that charged him with being a felon in possession of a firearm while knowing that he had been convicted of a crime punishable for a term exceeding one year (Count One), and possession with intent to distribute marijuana (Count Two).

On June 15, 2022, the Government filed a three-count Superseding Indictment (Doc. 22), which restates the initial Indictment's Counts One and Two and adds a third charge for distribution of a mixture or substance containing a detectable amount of methamphetamine as Count Three.

On July 26, 2022, the Government filed a Second Superseding Indictment (Doc. 37), which restates the initial Indictment's Counts One and Two, inserts a new charge alleging possession of a firearm in furtherance of a drug trafficking crime as Count Three, and charges the Superseding Indictment's Count Three (methamphetamine distribution) as Count Four.

On September 21, 2022, the Government filed a Third Superseding Indictment (Doc. 45). It mostly mirrors the Second Superseding Indictment, with one revision. The Second Superseding Indictment charged Mr. Robinson with distribution of a mixture or substance containing a detectable amount of methamphetamine; the Third Superseding

Indictment charges him with distribution of more than five grams of actual methamphetamine.

Mr. Robinson now faces four charges: felon in possession of a firearm (Count One), possession with intent to distribute marijuana (Count Two), possession of a firearm in furtherance of a drug crime (Count Three), and distribution of more than five grams of actual methamphetamine (Count Four).

## II.    LEGAL STANDARD

The Fourth Amendment of the United States Constitution imposes certain limitations on searches and seizures:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

U.S. Const. amend. IV. "While the 'ultimate touchstone' of any Fourth Amendment analysis is 'reasonableness,' the Supreme Court has long held that a warrant is required for all searches and seizures, unless an exception to the warrant-requirement applies." *United States v. Keck*, 2 F.4th 1085, 1088–89 (8th Cir. 2021) (citation omitted).

In a criminal case, a defendant may move to suppress the use of evidence at trial that she believes was obtained in violation of the Fourth Amendment, including any "fruit" derived from that evidence. *See Wong Sun v. United States*, 371 U.S. 471, 484–86 (1963). Such evidence is suppressed only when the Court finds: (1) "the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct," and (2) "the exclusionary sanction is appropriately imposed in a particular case." *United States v. Leon*, 468 U.S. 897, 906–07 (1984).

Here, the Government bears the burden of proving by a preponderance of the evidence that Mr. Robinson's Fourth Amendment rights were not violated during the December 7, 2021 traffic stop, or alternatively, that suppressing the evidence obtained as a result of that stop is not an appropriate remedy in this case. *See, e.g.*, *Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984) ("As a general rule, the burden of proof is on the defendant who seeks to suppress evidence, but on the government to justify a warrantless search.") (citation omitted); *cf. United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

## III.    DISCUSSION

### A.    Seizure and Detention of Mr. Robinson

The Court first assesses the legality of Mr. Robinson's seizure and subsequent detention. Whether Corporal Townsend lawfully stopped Mr. Robinson in the first place and whether the resulting detention exceeded its lawful scope may bear on the search's ultimate lawfulness.

"A person is seized within the meaning of the Fourth Amendment 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *United States v. Bowman*, 660 F.3d 338, 344 (8th Cir. 2011) (quoting *United States v. Mendenhall*, 446 U.S. 544, 545 (1980)). Accordingly, the Fourth Amendment's "protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Lillich*, 6 F.4th 869, 875 (8th Cir. 2021) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

A police officer "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop," *United States v. Collins*, 883 F.3d 1029, 1031–32 (8th Cir. 2018), if she reasonably suspects that "criminal activity may be afoot," *Terry v. Ohio*, 392 U.S. 1, 21, 30 (1968). However, "[a] lawful *Terry* stop may nonetheless violate the Fourth Amendment if it is excessively intrusive in its scope or manner of execution." *Haynes v. Minnehan*, 14 F.4th 830, 835 (8th Cir. 2021) (quotation marks omitted). "Once a vehicle is stopped based on reasonable suspicion or probable cause, officers may continue the stop only for the time necessary to attend to the stop's 'mission' and 'related safety concerns.'" *United States v. Allen*, 43 F.4th 901, 907 (8th Cir. 2022) (quotation marks omitted); *Rodriguez v. United States*, 575 U.S. 348, 355 (2015).

### 1.    Seizure

The Court concludes Corporal Townsend possessed reasonable suspicion of drug activity and probable cause of a traffic violation to justify the initial seizure of Mr. Robinson.[1]

To conduct a *Terry* stop, the officer must be "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *United States v. Maltais*, 403 F.3d 550, 554 (8th Cir. 2005). "Observations of the officers are considered 'as a whole, rather than as discrete and disconnected occurrences.'" *United States v. Kent*, 531

---

[1] Mr. Robinson does not dispute the traffic violation. His attorney stated on the record that Mr. Robinson does not challenge probable cause to make the traffic stop—on the basis of a traffic infraction—and thus the Court accepts that fact as true.

F.3d 642, 648 (8th Cir. 2008) (quoting *United States v. Poitier*, 818 F.2d 679, 683 (8th Cir. 1987)). Indeed, "[a]n officer may have reasonable suspicion to conduct a *Terry* stop based on a combination of factors even where no single factor, considered alone, would justify a stop." *United States v. Quinn*, 812 F.3d 694, 698 (8th Cir. 2016) (citing *Terry*, 392 U.S. at 22).

Reasonable suspicion may be based on information provided by a third party, including criminal or anonymous informants, so long as it bears some indicia of reliability. *See United States v. Mosley*, 878 F.3d 246, 252–53 (8th Cir. 2017) ("When evaluating tips, reasonable suspicion 'is dependent upon both the content of the information possessed by the police and its degree of reliability.'" (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014))). "Information may be sufficiently reliable to support a probable cause [or reasonable suspicion] finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence." *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993).

In *United States v. Nolen*, the Eighth Circuit explained, "the Supreme Court has recognized a distinction between a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, and an anonymous informant, who cannot so easily be held responsible." 536 F.3d 834, 839–40 (8th Cir. 2008) (cleaned up). Furthermore, the court continued, "there is also an important distinction between the two types of known informants: reliable informants and unproven informants." *Id.* at 841. Nevertheless, individuals unknown to the police or who have not previously provided tips may still be deemed reliable. But it usually requires "something

more," such as independent verification, which "occurs when the information (or aspects of it) is corroborated by the independent observations of police officers." *Id.* at 840.

Here, Detective Mackey received information about Mr. Robinson's drug trafficking activities from a known and reliable informant. Detective Mackey testified that he established a relationship with the CS in 2018. The CS previously participated in controlled buys of methamphetamine and cocaine that led to several convictions. The CS also provided Detective Mackey with information about other drug traffickers in the area.

In his testimony, Detective Mackey acknowledged that, prior to December 6, 2021, he had not worked with this particular CS in about a year. According to Detective Mackey, while the CS was "a long-time CS," he was also "hit or miss." Detective Mackey sometimes went six to eight months without hearing from him. Nevertheless, law enforcement has been able to corroborate every tip provided by the CS over the years, according to Detective Mackey.

Like reasonable suspicion, reliability is assessed according to the totality of the circumstances. Courts may consider factors such as richness of detail and specificity, basis of knowledge (e.g., eyewitness observation, as opposed to hearsay), contemporaneous reporting, accountability (e.g., use of the 911 system to report the tip), and whether there's any reason to believe the tipster had a motive to fabricate. *See Navarette*, 572 U.S. at 399*; Mosley*, 878 F.3d at 253. In the case at bar, these factors mostly enhance reliability. The CS claimed to have personally observed the firearms in Mr. Robinson's possession, and he was able to provide a description of Mr. Robinson, identify his vehicle and residence, and offer up his phone number. Additionally, the CS

had a pre-existing relationship with Detective Mackey, who would know how to get in touch should the tip turn out to be bogus.

The CS's motive, however, slightly undermines the otherwise strong evidence of reliability. The CS had charges pending—and they related directly to Mr. Robinson. That may have given the CS a strong incentive to fabricate information.

Detective Mackey testified that the CS told him he was out on bond and had been caught with a gun. The CS claimed the gun belonged to Mr. Robinson, who had made "veiled threats" of bodily harm if the CS did not return it. Getting Mr. Robinson off the street would clearly have benefitted the CS. There was the safety concern, and the CS might have received leniency for providing information to law enforcement. Furthermore, if the gun police found in his possession was connected to Mr. Robinson, that might have even mitigated the CS's criminal liability. On the other hand, providing false information in these circumstances could arguably increase the consequences the CS already faced, which perhaps negates the ill-motive to some extent.

Ultimately, the Court finds the CS reliable. "[A] lower degree of reliability does not foreclose the use of information, [and] instead only makes necessary a greater amount of other reliable information to establish probable cause." *United States v. Armstead*, 112 F.3d 320, 322 n.3 (8th Cir. 1997). Here, Detective Mackey independently verified almost all of the information. Police reports placed Mr. Robinson, albeit intermittently, at the address provided by the CS, and police observed him there. A silver vehicle was parked in front of the home, and police watched Mr. Robinson get into it and drive away. Mr. Robinson was also carrying a black backpack when he approached the house, and it remained with him when he left.

Only two facts, discovered after the traffic stop began, potentially conflict with the CS's statements, and neither meaningfully undermines the CS's credibility. *See Mosley*, 878 F.3d at 254 ("Discrepancies between the information provided in the tip and the facts on the ground . . . do not alone undermine reasonable suspicion, especially where there are other factors corroborating the tip and reasonable explanations for the discrepancies."). First, the CS alleged Mr. Robinson had been living in Fayetteville for several months. While waiting for the K-9 Unit to arrive, Mr. Robinson told Corporal Townsend he had only been there a day and a half. Second, the CS claimed Mr. Robinson was selling meth and marijuana but only the latter was discovered in Mr. Robinson's vehicle. The CS later told Detective Mackey that Mr. Robinson was "out" of meth.

Mr. Robinson argues that while the police corroborated some of the CS's information, the facts they verified did not evince criminal activity. Anyone watching Mr. Robinson could have discerned that he often wore a black backpack and drove a silver car—and neither suggest drug activity. That is true. But "[i]f information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable." *Williams*, 10 F.3d at 593.

Finally, just as Detective Mackey reasonably relied on the information provided by the CS, Corporal Townsend reasonably relied on the information provided by Detective Mackey. When one officer communicates the facts supporting reasonable suspicion to another officer, the collective knowledge doctrine "imputes the knowledge of all officers involved in an investigation upon the seizing officer in order to uphold an otherwise invalid

search or seizure." *United States v. Banks*, 514 F.3d 769, 776 (8th Cir. 2008) (quotation marks omitted).

How much information must one officer convey to another in order to invoke the collective knowledge doctrine? In the Eighth Circuit, the answer is very little. In *United States v. Robinson*, for example, a detective told the "Patrol dispatcher only that 'I need some officers to stop this maroon Cadillac.'" 664 F.3d 701, 703 (8th Cir. 2011). The defendant objected to the stop, arguing that because the patrol officer who executed the traffic stop did not testify at the suppression hearing, "the government failed to present evidence of what the officer who actually made the stop knew when he stopped the Cadillac." *Id.* at 704 (quotation marks omitted). The district court and appellate panel rejected that argument, explaining that it "misconstrues the requirement that the collective knowledge doctrine only applies if there is 'some degree of communication.'" *Id*. While the collective knowledge doctrine requires courts to "distinguish between officers functioning as a 'search team' and officers acting as independent actors who merely happen to be investigating the same subject," it does not require "all the relevant collective knowledge of the team be communicated to the officer who made the stop." *Id*. The detective requesting assistance in *Robinson* possessed reasonable suspicion, and that was enough for both courts.

*Robinson* goes further than the case at bar requires. Detective Mackey expressly pulled Corporal Townsend into the investigation, stationing him near the house in advance of the traffic stop. Although Detective Mackey testified that he told Corporal Townsend simply to take the stop "as far as he could"—indicating that Corporal Townsend did not merely act in his stead—Detective Mackey also communicated the actual facts

supporting reasonable suspicion to Corporal Townsend. Before the traffic stop, Detective Mackey told Corporal Townsend Mr. Robinson's name, the address and vehicle he drove, that he carried a black backpack that law enforcement believed may contain controlled substances and firearms, and that Mr. Robinson was a felon.

Accordingly, the Court finds Corporal Townsend possessed reasonable suspicion of drug activity to conduct a *Terry* stop on Mr. Robinson.

### 2.    Detention

The Court concludes Corporal Townsend justifiably detained Mr. Robinson on the basis of reasonable suspicion of drug activity and probable cause of a traffic violation. However, "[a] *Terry* stop may become an arrest, requiring probable cause, if the stop lasts for an unreasonably long time or if officers use unreasonable force." *United States v. Johnson*, 31 F.4th 618, 623 (8th Cir. 2022) (quoting *Waters v. Madson*, 921 F.3d 725, 737 (8th Cir. 2019)). An officer may extend the stop to investigate a new matter only if she develops additional reasonable suspicion or probable cause during the encounter. *See United States v. Marin*, 988 F.3d 1034, 1042 (8th Cir. 2021) ("An officer conducting a traffic stop who discovers information leading to reasonable suspicion of an unrelated crime may extend the stop and broaden the investigation."). In determining whether an investigatory detention is reasonable, the Court evaluates "the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). The Court also considers "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Id.* at 686.

Mr. Robinson contends Corporal Townsend lacked reasonable suspicion to extend the traffic stop. The Government argues, first, that Mr. Robinson consented to the search, rendering the entire inquiry unnecessary, and second, that Corporal Townsend developed sufficient reasonable suspicion to justify detaining Mr. Robinson until the K-9 Unit arrived. After watching the bodycam footage and reviewing all other evidence, the Court is inclined to believe Mr. Robinson did not behave in such a way while detained to independently justify reasonable suspicion of drug activity. However, the Court need not—and does not—reach this or the consent issue. Corporal Townsend reasonably suspected drug activity prior to pulling Mr. Robinson over, and the Court finds the amount of time Corporal Townsend detained Mr. Robinson was reasonable in light of that purpose.

"Time is an important factor in distinguishing between an investigative stop and a de facto arrest." *United States v. Bloomfield*, 40 F.3d 910, 916–17 (8th Cir. 1994). In *Rodriguez*, the Supreme Court held that extending a traffic stop based on a traffic violation to allow for a dog sniff unreasonably extends the duration of the stop. 575 U.S. at 348.

In *United States v. Magallon*, law enforcement conducted an investigative stop on a vehicle they reasonably suspected contained methamphetamine. 984 F.3d 1263 (8th Cir. 2021). Police officers separated the three occupants, placing one of them in the backseat of a locked patrol car. The officers questioned the other two occupants first, leaving the third sitting in the backseat for nearly an hour. He was then questioned by police for another 20 minutes before providing consent for them to search his car.  Later, he moved to suppress the meth discovered in his vehicle. *Id.* at 1279.

The Eighth Circuit explained that the "mission of the stop was to investigate the [vehicle] and its passenger's involvement with drug trafficking," and the officers'

reasonable suspicion remained intact throughout the stop. *Id.* The panel affirmed the district court's assessment: "[A]ddressing the suspicion of drug activity required time" and, because the officers worked diligently to confirm or dispel their suspicions, "law enforcement did not exceed the mission of the stop." *Id.*

Similarly, in *United States v. Donnelly*, the defendant's car had side-swiped another vehicle on the highway. 475 F.3d 946 (8th Cir. 2007). An officer detained the defendant for 80 minutes while waiting for a drug-dog, a delay the Eighth Circuit deemed reasonable. The officer had "called in his request for a drug-dog within twelve minutes of his arrival and immediately after he developed a reasonable suspicion of narcotics possession." *Id.* at 954. *See also Maltais*, 403 F.3d at 557–58 (holding that a three-hour delay allowing a drug dog to reach the remote location of the investigation was acceptable because the officers "acted with diligence and pursued the quickest and least intrusive means of investigation reasonably available to confirm or dispel their . . . suspicions that [the defendant] was engaged in drug trafficking."); *Bloomfield*, at 917 (finding one-hour period between initial traffic stop and defendant's arrest not "an unreasonable period to wait for a drug dog to verify [the officer's] suspicion").[2]

About 35 minutes elapsed between when Corporal Townsend stopped Mr. Robinson and when sufficient probable cause developed to justify searching the vehicle. Corporal Townsend pulled Mr. Robinson over at 3:54 p.m. At 4:02 p.m., after searching Mr. Robinson a second time, Corporal Townsend requested the assistance of a K-9 Unit, which arrived at 4:26 p.m. At 4:29 p.m., the K-9 handler informed Corporal Townsend that

---

[2] *Donnelly*, *Maltais*, and *Bloomfield* were decided prior to the Supreme Court's decision in *Rodriguez*. However, in each of these prior cases, the Eighth Circuit concluded the search did not extend beyond what was reasonable to achieve the officer's purpose in executing the stop. *Rodriguez* does not change that analysis.

the canine, Dex, gave a positive alert for the odor of narcotics. There is no evidence that Corporal Townsend unduly delayed his investigation, and under Eighth Circuit precedent, that amount of time is not unreasonable.

### B.    Probable Cause to Search

"Probable cause to believe that an automobile contains contraband or evidence of criminal activity has long been held to justify a warrantless search of the automobile and seizure of the contraband." *Keck*, 2 F.4th at 1089 (quoting *United States v. Shackleford*, 830 F.3d 751, 753 (8th Cir. 2016)). "A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (cleaned up). This standard is assessed under the totality of the circumstances, not "rigid rules, bright-line tests, and mechanistic inquiries." *Id.* at 244. Probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.*

"If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *United States v. Perez*, 29 F.4th 975, 986 (8th Cir. 2022) (quoting *Harris*, 568 U.S. at 246–47). "This presumption may be overcome if a defendant can show, either through cross-examination or introducing his own fact or expert witness, the inadequacy of a certification or training program or that the circumstances surrounding a canine alert undermined the case for probable cause." *Id.* (quoting *United States v. Gonzalez*, 781 F.3d 422, 429 (8th Cir. 2015)).

Mr. Robinson does not dispute that a positive alert by a "well-trained narcotics detection dog" may provide probable cause that drugs are present. *United States v. Place*, 462 U.S. 696, 707 (1983). Instead, he challenges the reliability of the alert at issue here.

To determine "whether a drug dog sniff is reliable enough to give police officers probable cause to conduct a search," the Court considers "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Harris*, 568 U.S. at 248.

The K-9 Officer, Corporal McDaniel, testified that his canine partner, Dex, was trained to identify the presence of four odors: marijuana, meth, cocaine, and heroin. On December 7, 2021, Dex's behavior changed as he was making his way around the vehicle at the front passenger side. According to Corporal McDaniel, he stopped moving, raised his ears, closed his mouth, and then went into a sit in next to the front passenger-side door. Corporal McDaniel explained that is Dex's "final response."

As it turns out, there were several items in the car that might have emitted a narcotics order: two digital scales, one located under the driver's seat and the other in the floorboard behind the driver's seat; a glass pipe with residue located in the front passenger compartment area,[3] and two large jars with approximately 227.8 grams of marijuana, sitting on top of dryer sheets in the black backpack, which was placed on the seat behind the driver. Mr. Robinson argues that given the large amount of marijuana in

---

[3] Detective Mackey testified that he considered anything "beyond the backrest of the front seat forward" to be part of the front passenger compartment area. He acknowledged that he considers the center console to be part of this area. He did not know precisely where in the front passenger area the pipe was located.

the backseat—and that Dex is trained to alert where the scent is strongest—Dex's failure to do so closer to the backpack demonstrates the alert was unreliable.

First, while not challenged by Mr. Robinson, the Court notes that it does not identify any issue in Corporal McDaniel or Dex's general qualifications. Corporal McDaniel had handled a dog for the last 16 years of his 24-year career in law enforcement. As of December 2021, he had been working with Dex for five years. Corporal McDaniel is certified by National Narcotic Detective Dog Association, as well as State of Arkansas. *See* Exs. 10 & 11. Both organizations certified him and Dex together as a team, and Corporal McDaniel worked exclusively with Dex. Every week, Corporal McDaniel spent at least five hours on training with Dex, in addition to the training they did on duty.[4]

Furthermore, Corporal McDaniel credibly explained why Dex might have alerted near the front passenger door rather than the backseat on the driver's side. He testified that it's not unusual for a dog to locate or give a final response near one part of a vehicle but drugs to be discovered elsewhere in the car. The canine alerts to the presence of odor, not the presence of the drug. According to Corporal McDaniel, while a substance may be located in one part of the car, it's not unusual for environmental factors to force

---

[4] Corporal McDaniel kept a logbook to record Dex's performance. The 2021 records were accepted into evidence. *See* Ex. 12. He testified that Dex accurately located narcotics about 95% of the time during training.

Defense counsel highlighted one issue with the logbook: The record for December 7, 2021—the date in question—does not include this particular "call-out." Corporal McDaniel testified that he usually entered data in the log diligently and did not know why he noted the December 7 training that he and Dex participated in but not the call-out that occurred with Mr. Robinson. He explained that he and Dex had already wrapped up their day and were at home when they got the request for assistance. He speculated that perhaps he forgot to update the log a second time after the late afternoon call. The Court questioned Corporal McDaniel about this issue and ultimately determined it did not undermine his credibility, or the information he provided regarding Dex's accuracy and reliability.

that odor out somewhere else. On this basis, the Court concludes the canine sniff was sufficiently reliable to support probable cause to search Mr. Robinson's vehicle.

### C.    Scope of the Search

While Dex alerted next to the front passenger door, Corporal Townsend began his search in the backseat on the driver's side. Mr. Robinson argues that given where Dex alerted, a reasonably prudent person would not think that a search would reveal contraband in the backpack. He contends Corporal Townsend lacked probable cause to search the backpack.

This argument is unavailing. "[T]he automobile exception's scope extends to the 'automobile and the containers within it where officers have probable cause to believe contraband or evidence is contained.'" *Keck*, 2 F.4th at 1089 (brackets omitted) (quoting *California v. Acevedo*, 500 U.S. 565, 580 (1991)). When Dex's alert provided probable cause that controlled substances would be found in the car, Corporal Townsend was entitled to look in any location that drugs might be reasonably found.

### IV.    CONCLUSION

For these reasons, Mr. Robinson's Motion to Suppress (Doc. 33) is **DENIED. IT IS SO ORDERED** on this 30th day of September, 2022.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE